PHE, INC., et al., Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

Civ. A. No. 90–0693.

United States District Court, District of Columbia.

July 23, 1990.

Order Amending Opinion Aug. 28, 1990.

Bruce J. Ennis, David W. Ogden, Edward B. Foley, Julie M. Carpenter, Jenner & Block, Washington, D.C., for plaintiffs.

Asst. U.S. Atty. Marina Utgoff Braswell, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff PHE, Inc., d/b/a Adam & Eve ("PHE"), a North Carolina corporation which engages in, *inter alia*, mail order distribution of sexually oriented magazines and videotapes, and its President and principal owner, Philip D. Harvey, bring this action for declaratory and injunctive relief to restrain defendants United States Department of Justice, United States Attorney General Richard Thornburg, the National Obscenity Enforcement Unit ("NOEU") and its Acting Director Patrick Trueman, Assistant United States Attorney for the District of Utah Richard N.W. Lambert, and United States Attorney for the Western District of Kentucky Joseph M. Whittle from continuing to engage in what plaintiffs characterize as unconstitutional and bad faith conduct calculated to coerce plaintiffs to cease distribution of constitutionally protected speech. Specifically, plaintiffs contend that defendants have used or threatened to use their prosecutorial powers, including simultaneous multiple prosecutions and/or multiple consecutive prosecutions for obscenity, seizures of expressive materials, and criminal subpoenas, to coerce plaintiffs into ceasing distribution of certain sexually oriented materials which defendants have acknowledged would not be found to be obscene under current legal standards.

Presently pending before the Court are plaintiffs' motion for preliminary injunction and defendants' motion to dismiss. The Court heard argument on these motions at a hearing held on April 19, 1990. Upon consideration of the parties' memoranda, argument of counsel, and the entire record, plaintiffs' motion for preliminary injunction

shall be granted and defendants' motion to dismiss shall be denied.

## I.

### A. *Plaintiffs' Business*

PHE is one of the largest retail distributors of sexually oriented magazines and videotapes in the United States and has been engaged in this business for several years.[1] In an effort to ensure that the materials they distribute will not be found to be obscene, plaintiffs have attempted to obtain guidelines from the federal officials entrusted with the enforcement of obscenity laws. These efforts have proved largely unsuccessful. Patrick Trueman, Acting Director of the NOEU, declined to give plaintiffs any guidance whatsoever, asserting that to do so would itself be a First Amendment violation.[2] As a result of requests made under the Freedom of Information Act ("FOIA"), plaintiffs obtained the "obscene matter file" in the FBI Library, which consists "only of commercially reproduced pornography relating to the sexual exploitation of children and commercial adult pornography dealing with sadomasochism, bestiality, and coprophilia behavior." II FBI Manual of Investigative Operations and Guidelines § 145–2(2) (August 12, 1986).[3] Plaintiffs contend that none of the materials they distribute would violate any of these guidelines.

Plaintiffs also utilize internal review procedures to guarantee that the materials they distribute do not violate the law. For instance, plaintiffs do not distribute materials depicting rape or sexual violence.[4] In addition, plaintiffs employ an external review procedure, by which two independent experts, selected from a group of psychiatrists, clinical psychologists and/or trained and credentialed sex therapists, review all materials to be distributed. If either expert believes that any material fails any *one* of the three prongs of the *Miller* test for obscenity,[5] that material is immediately rejected and never offered for sale by plaintiffs.[6] Plaintiffs sell their materials only on request, only to adults, and only for use in the privacy of the customer's home.[7]

### B. *Defendants' Actions*

Plaintiffs allege that defendants' initial efforts to put plaintiffs out of business began in 1986. On May 29 of that year, federal prosecutors in Utah and the Eastern District of North Carolina, in coordination with state prosecutors in North Carolina, organized and conducted a search of plaintiffs' premises.[8] According to Marguerite Kohus, an employee of PHE, the

---

1. Complaint, ¶ 34.

2. *Id.* ¶¶ 39–40; Declaration of Bruce J. Ennis, ¶¶ 2–3. Plaintiffs further allege that Trueman responded to plaintiffs' inquiry some two years after it was made. Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("Plaintiffs' Motion"), pp. 8–9.

3. Complaint, ¶ 43.

4. Plaintiffs' Motion, at 10.

5. In *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court established the following three part test for determining whether a work is "obscene":
 (1) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;
 (2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(3) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24. Community standards are not used to evaluate the literary, artistic, political or scientific value of a work. *Pope v. Illinois,* 481 U.S. 497, 500–01, 107 S.Ct. 1918, 1920–21, 95 L.Ed.2d 439 (1987).

6. Complaint, ¶ 46. Because plaintiffs refuse to distribute materials which one of the experts concludes satisfies only *one* of the three prongs of the *Miller* standard, this procedure is more restrictive than the *Miller* test itself, which requires that *all three* prongs be satisfied before a work is considered obscene.

7. *Id.* ¶ 48. All materials bear a notice stating that they are "intended for viewing/reading by adults only, for use in the privacy of customer's home. Not for public use." *Id.*

8. *Id.* ¶ 66.

day long search was extremely intrusive. Federal and state agents from Utah and North Carolina conducted the search jointly, posting armed guards at the doors, closing the switchboard, and ordering all employees into a single area, refusing to allow them to leave until each had submitted to an interview, which they were told they were not free to refuse. The agents refused to allow employees to speak with their attorneys, including a company attorney who had come to the premises for the purpose of advising employees of their legal rights. The agents searched the personal purses and briefcases of the employees without warrant and over their objection, and took their photographs with threats of public embarrassment if they did not consent. As a result of this episode, 11 employees, constituting roughly eight percent of PHE's workforce, terminated their employment.[9] Simultaneously, federal agents served plaintiffs' employees with 118 subpoenas.[10] The United States District Court for the Eastern District of North Carolina subsequently characterized these subpoenas as government "harassment" of plaintiffs and their employees.[11]

Beginning after the search of plaintiffs' premises and continuing through 1986, the defendants made clear that PHE, Harvey, and other individuals associated with PHE would be prosecuted in multiple jurisdictions across the United States unless plaintiffs agreed to substantially curtail what they contend are their constitutionally protected expressive activities nationwide, and to go out of business entirely in Utah.[12] In one meeting, Brent Ward, then U.S. Attorney for the District of Utah, and defendant Lambert stated that the only way for plain-tiffs to avoid multidistrict federal prosecution would be if plaintiffs agreed to cease distribution of all sexually oriented expressive materials nationwide, except for films that had received an "R" or less restrictive rating from the Motion Picture Association of America.[13] Among the other materials included in the prohibition were unrated films, magazines, or books containing "mere nudity" as well as *Playboy* and *Penthouse* magazines and the book *The Joy of Sex*.[14] When plaintiffs' representatives stated that this demand would require plaintiffs to surrender their First Amendment rights, Ward and Lambert acknowledged that their position would have this effect.[15] Although the plaintiffs did not agree to these conditions, they decided to cease distribution of all sexually oriented materials in Utah and, for approximately three years, did not distribute any sexually oriented materials in North Carolina.[16]

In a separate meeting on September 10, 1986, Ward and Lambert stated that as a condition for non-prosecution, plaintiffs would have to discontinue entirely their participation in the business of sexually oriented visual material, without regard to whether the material was protected by the First Amendment.[17] Mr. Ward confirmed that this included "soft porn" and other material that would not be prosecutable if distributed by another person.[18] The prohibition would not extend to films with an "R" or less restrictive rating but other materials, such as *Playboy* magazine, could not be distributed.[19] Lambert again stated that the prohibition would include "mere nudity" and, in addition, stated that the prosecutors wanted Mr. Harvey "out of the business." [20] After the prosecutors re-

9. Declaration of Marguerite E. Kohus ("Kohus Decl."), ¶ 12.

10. Complaint, ¶ 67.

11. *Id.*

12. *Id.* ¶¶ 69, 79; Declaration of David W. Ogden ("Ogden Decl."), ¶ 6; *see id.* ¶ 3, Exhibit B.

13. Complaint, ¶ 80; Ogden Decl., ¶ 7.

14. Ogden Decl., ¶ 8.

15. *Id.*

16. *Id.* ¶ 9. Plaintiffs contend that the decision to cease distribution was made as a result of these threats of prosecution.

17. Declaration of John A. Mintz ("Mintz Decl."), ¶ 4.

18. *Id.* ¶ 5.

19. *Id.*

20. *Id.* ¶ 6.

buffed plaintiffs' protests that these demands would require plaintiffs to surrender their First Amendment rights, then Assistant Attorney General for the Criminal Division, William Weld, endorsed the prosecutors' position as "proper."[21]

In November 1986, plaintiffs' representatives wrote to William Delahoyde, Assistant United States Attorney for the Eastern District of North Carolina, to protest defendants' threats that they would be subjected to multiple prosecutions, pointing to the Department of Justice policy, reflected in the United States Attorney's Manual, which discouraged such action.[22] On December 4, 1986, the U.S. Attorney responded to that letter, confirming that plaintiffs would be prosecuted in both that District and in Utah, and referred to the Department of Justice policy as not properly the subject of pre-indictment contention.[23] Plaintiffs thereafter wrote to Mr. Weld seeking an assurance that they would not be subject to multiple prosecutions. Those letters were never answered.[24]

Plaintiffs also allege that Robert Showers, then Assistant United States Attorney for the Eastern District of North Carolina, attempted to secure the assistance of the Federal Bureau of Investigation ("FBI") in the effort to suppress plaintiffs' legitimate activities. It is plaintiffs' contention that the FBI informed Showers that the materials distributed by plaintiffs were not within the scope of FBI guidelines for the prosecution or investigation of obscenity and refused to provide assistance.[25]

Plaintiffs further assert that Showers and other federal agents sought to enlist the assistance of state prosecutors in Alamance County, North Carolina, encouraging them to subject plaintiffs to multiple prosecutions so that they would be unable to adequately defend themselves despite the fact the United States Attorney's Manual prohibited multiple obscenity prosecutions unless "the materials are of such an explicit nature that there can be no question as to their obscenity." United States Attorney's Manual § 9–75.120 (Nov. 9, 1984).[26] On August 4, 1986, plaintiffs were indicted by a state grand jury on state obscenity charges in Alamance County, North Carolina. Plaintiffs were acquitted on all state obscenity charges on March 26, 1987.[27] Despite these acquittals, plaintiffs were advised that they would still be prosecuted on federal obscenity charges in the Eastern District of North Carolina and in Utah for distributing similar expressive materials.[28]

In the meantime, on February 10, 1987, then Attorney General Edwin Meese III created the National Obscenity Enforcement Unit, a special task force within the United States Department of Justice whose mission was to spearhead and coordinate the federal government's efforts in the areas of obscenity and child pornography. Meese selected Showers to lead this task force. In September 1987, the Department of Justice changed its policy on multiple prosecutions. Unlike the previous policy, the new policy "encourage[s]" multiple prosecutions "where the size of the [defendant's] organizational structure suggests that a multiple district prosecution approach . . . will be most effective. United States Attorney's Manual § 9–75.310 (Oct. 1, 1988).[29]

On July 1, 1988, in accordance with this new policy, the Department of Justice announced "Project PostPorn," a series of multidistrict indictments against distribu-

21. Complaint, ¶ 84; Mintz Decl., ¶ 7, Exhibit B, p. 2.

22. Complaint, ¶ 85.

23. *Id.* ¶ 86.

24. *Id.* ¶ 87.

25. *Id.* ¶ 76.

26. *Id.* ¶ 77.

27. *Id.* ¶ 89. Interestingly, the jury foreman publicly stated that the jury reached its verdict in five minutes but continued its discussion for an hour to avoid embarrassing the prosecutors. He also stated that the jury had considered apologizing to Harvey for the ordeal he had undergone. *Id.;* Ogden Decl., ¶ 14 & Exhibit G.

28. Complaint, ¶ 91.

29. *Id.* ¶¶ 92–93.

**20**

tors of sexually oriented materials.[30] The project was a cooperative effort between the Department of Justice and the Postal Inspection Service and constituted the first nationwide effort to identify and prosecute violators of federal laws prohibiting the use of the mails to advertise and distribute obscene materials. Although plaintiffs were not among those distributors who were indicted, they were informed by Lambert that they would be prosecuted as soon as he had disposed of the Project PostPorn indictments.[31]

In March 1989, Lambert informed one of plaintiffs' representatives that the federal government intended to indict PHE and Mr. Harvey.[32] In November 1989 Lambert again informed one of plaintiffs' representatives that plaintiffs would be indicted in the District of Utah in the near future.[33] In December 1989, a federal grand jury, working with federal prosecutors in the Western District of Kentucky, issued to PHE a subpoena *duces tecum* to produce a broad range of materials and financial data.[34] On or about March 12, 1990, Terry Cushing, Assistant United States Attorney for the Western District of Kentucky, informed one of plaintiffs' representatives that he intended to obtain an indictment of plaintiffs on federal obscenity charges in that jurisdiction. Cushing indicated that he and Lambert had discussed PHE and their investigations of plaintiffs on numerous occasions and that he saw no obstacle to simultaneous multiple prosecutions of plaintiffs in both Utah and the Western District of Kentucky.[35] On or about March 14, 1990, Lambert again confirmed that a grand jury investigation of plaintiffs was underway in Utah, that he anticipated in-

dictments as a result of that investigation, and that he would issue new grand jury subpoenas within the next few days.[36]

## II.

It is fundamental that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Furthermore, the factual allegations of the complaint must be presumed true and liberally construed in favor of plaintiff, *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1506 (D.C.Cir.1984); 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 1357, p. 594 (1969), and plaintiff is entitled to all favorable inferences which may be drawn from those allegations. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Accordingly, it must be presumed, as plaintiffs allege, that defendants are acting in a coordinated effort to cause plaintiffs to face criminal prosecutions in multiple federal district courts for the purpose of coercing plaintiffs to refrain from distributing materials which defendants acknowledge are constitutionally protected. It must also be presumed that defendants are pursuing this strategy of multiple prosecutions in order to win a war of economic attrition and drive plaintiffs out of their chosen profession.

As explained below, if defendants are indeed acting with this intention, then

---

30. *Id.* ¶ 94; Ogden Decl., ¶ 15 & Exhibit H.

31. Complaint, ¶ 95; Ogden Decl., ¶ 16.

32. Complaint, ¶ 97; Ogden Decl., ¶ 17.

33. Declaration of Jerome H. Mooney ("Mooney Decl."), ¶ 5.

34. Ogden Decl. ¶ 20 & Exhibit I. This subpoena contained an order which stated that PHE was not permitted to disclose the existence of the subpoena or to notify anyone that the information contained therein had been requested. Plaintiffs maintain that this directive exemplifies what they characterize as defendants' will-

ful and intentional bad faith, in that defendants knew this language violated the plain meaning of Fed.R.Crim.P. 6(e) and that defendants knew that the inclusion of this language was not authorized by the U.S. Attorney's Manual and had in fact previously been held to be unauthorized and improper in a case decided by the United States Court of Appeals for the First Circuit. *Complaint*, ¶¶ 101–102.

35. Complaint, ¶ 103; Ogden Decl., ¶ 21.

36. Complaint, ¶ 104; Ogden Decl., ¶ 22.

plaintiffs have not only stated a claim upon which relief may be granted, but they have also satisfied the first element required for the granting of preliminary injunctive relief, i.e., a substantial likelihood of success on the merits.[37]

Plaintiffs argue that the facts of this case fall squarely within a long line of cases in which courts have held that the First Amendment prohibits the government from using threats of prosecution for the purpose of suppressing constitutionally protected activity, including the distribution of non-obscene, sexually oriented materials. Defendants, on the other hand, raise a myriad of arguments in support of their motion to dismiss and in opposition to plaintiffs' motion for a preliminary injunction. They contend that the federal obscenity statutes, which have passed constitutional muster, permit multidistrict prosecutions of individuals who mail obscene materials to different jurisdictions, as each mailing is an independent violation which may be charged in each separate jurisdiction in which it occurs. Defendants also assert that this Court, sitting in equity, cannot enjoin the ongoing or future federal prosecutions because plaintiffs have an adequate remedy at law—they can raise these same objections after indictment by motion pursuant to Fed.R.Crim.P. 12(b)(1). Intertwined in this argument is the assertion that an injunction against future indictments would violate the doctrine of separation of powers as well as the final judgment rule. Defendants next maintain that what plaintiffs characterize as "threats" of prosecution if they refuse to cease mailing materials that are sexually explicit but not obscene are nothing more than plea bargain negotiations which plaintiffs are free to reject; these "offers" therefore do not amount to prosecutorial misconduct. As

explained below, not only do plaintiffs' allegations that defendants are acting in bad faith for the purpose of suppressing plaintiffs' constitutional rights state a claim for relief, but the ample case law supports a court's exercise of its equitable power to enjoin such misconduct.

Analysis begins with the Supreme Court's decision in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). There, the Rhode Island Commission to Encourage Morality in Youth, established by the Rhode Island legislature, notified distributors and retailers of publications that certain books and magazines were "objectionable" and thanked them in advance for their cooperation, reminding them that the Commission had the duty to recommend prosecution for distributors of obscenity. This notice was followed up by a visit from a local police officer who sought to determine what action the distributor had taken in response to the prior notification. The Supreme Court found that these informal pressure tactics were designed to suppress the publications which the Commission found "objectionable" and therefore constituted an illegal infringement on plaintiffs' First Amendment rights, stating that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings if they do not come around ..." *Id.* at 68, 83 S.Ct. at 638. The Court recognized that this "informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief." *Id.* at 67, 83 S.Ct. at 638. In deciding whether such relief would be appropriate, it was noted that the proper focus of inquiry is on the substance, rather than the form, of the government conduct. *Id.*

In *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the

---

**37.** A preliminary injunction may be granted only when the plaintiff demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is granted; and (4) that the public interest favors entry of a temporary restraining order. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977);

*accord, Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,* 259 F.2d 921, 925 (D.C. Cir.1958). This test is not a wooden one, for as our court of appeals has noted, relief may be granted "with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. United States Nuclear Regulatory Commission,* 772 F.2d 972, 974 (D.C.Cir.1985) (per curiam) (emphasis in original). *See also Holiday Tours,* 559 F.2d at 843.

Supreme Court went beyond *Bantam Books* to find that federal courts may enjoin not only threats of prosecution, but indictments and prosecutions that are calculated to infringe upon First Amendment rights. The *Dombrowski* court found that law enforcement officials in Louisiana had used their official powers to chill the First Amendment activities of plaintiffs, civil rights workers active in fostering civil rights for blacks in Louisiana and other southern states. After their offices were raided and their records seized, plaintiffs were threatened with prosecution for their activities. Ultimately, indictments were returned against them. In their complaint, plaintiffs attacked the good faith of the law enforcement officials in bringing the indictments, alleging that the officials' threats to enforce the criminal statutes were not made with any expectation of securing valid convictions, but rather were part of a plan which utilized arrests, seizures, and threats of prosecution under color of the statutes to harass plaintiffs and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana. The Supreme Court held that plaintiffs stated a claim for injunctive relief because they alleged that the prosecutions were brought for the purpose of discouraging the exercise of plaintiffs' First Amendment rights.

Following *Bantam Books* and *Dombrowski,* federal courts have granted injunctions against criminal prosecutions brought in bad faith to suppress constitutionally protected activity. For instance, in *Council for Periodical Distributors Ass'n v. Evans,* 642 F.Supp. 552 (M.D.Ala.1986), *aff'd,* 827 F.2d 1483 (11th Cir.1987) (*"CPDA "*), the district attorney in Montgomery County, Alabama met with a local book and magazine distributor and asked him to voluntarily stop selling sexually explicit magazines, informing him that the magazines probably violated Alabama's obscenity laws and that if the distributor did not cooperate, that he would initiate a civil nuisance proceeding or a criminal obscenity prosecution. When the distributor refused to comply, the district attorney established a task force on pornography to consider alternatives for combatting the sale and distribution of such materials. As a result of these discussions, the district attorney informed the distributor and local retailers that unless they signed a consent decree agreeing to cease distribution of these materials, they would be indicted for violating the state's obscenity laws. Other threats of prosecution were made as well. The distributor then brought suit against the prosecutor, who immediately initiated grand jury proceedings against the distributor and others.

The District Court held that the prosecutor's conduct amounted to a system of informal administrative prior restraints which was unconstitutional under *Bantam Books.* Accordingly, the court entered an injunction preventing the defendants from instituting criminal proceedings against plaintiffs for actions occurring prior to the filing of the lawsuit. *Id.* at 568.

In *Black Jack Distributors, Inc. v. Beame,* 433 F.Supp. 1297 (S.D.N.Y.1977), plaintiffs, vendors of sexually explicit materials, had alleged that the Police Department and the District Attorney's Office were engaged in a joint effort to clamp down on sexually oriented businesses in Manhattan in general and, more specifically, to force plaintiffs out of business. Daily arrests and seizures were made at plaintiffs' premises "in a manner calculated to maximize the negative impact on plaintiffs' business." *Id.* at 1306. Defendants' admitted purpose was to discourage plaintiffs' employees from continuing to work in plaintiffs' stores and, ultimately, to close the stores or force them to abandon the sale of sexually oriented materials. *Id.* at 1307. The court granted a preliminary injunction which prevented the New York City Police Commissioner from harassing plaintiffs through enforcement of obscenity laws which were undertaken in bad faith and for the purpose of injuring plaintiffs' business.

The other cases cited in plaintiffs' memorandum support their argument, i.e., it is within the equitable powers of a federal court to issue injunctions preventing bad

faith prosecutions which are brought to discourage First Amendment activities. *See Lewellen v. Raff,* 843 F.2d 1103 (8th Cir.1988), *cert. denied,* 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989); *Fitzgerald v. Peek,* 636 F.2d 943 (5th Cir.), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *Wilson v. Thompson,* 593 F.2d 1375 (5th Cir.1979); *Krahm v. Graham,* 461 F.2d 703 (9th Cir.1972); *The Video Store, Inc. v. Holcomb,* 729 F.Supp. 579 (S.D.Ohio 1990); *ACLU v. City of Pittsburgh,* 586 F.Supp. 417 (W.D.Pa.1984); *Penthouse International, Ltd. v. McAuliffe,* 436 F.Supp. 1241 (N.D.Ga.1977), *aff'd,* 610 F.2d 1353 (5th Cir.1980); *United Artists Corp. v. Gladwell,* 373 F.Supp. 247 (N.D.Ohio 1974); *Drive in Theaters, Inc. v. Huskey,* 305 F.Supp. 1232 (W.D.N.C.1969), *aff'd,* 435 F.2d 228 (4th Cir.1970).

Defendants nevertheless argue that this Court cannot enjoin ongoing criminal prosecutions because plaintiffs have an adequate remedy at law—they can raise their objections by motion in each district in which they are indicted. Defendants vigorously maintain that the issuance of a preliminary injunction would violate a number of principles, including separation of powers between the Judicial and Executive Branches of government and the final judgment rule. Defendants' arguments are misplaced.

Our Supreme Court stated almost two decades ago that "courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger v. Har-*

*ris,* 401 U.S. 37, 43–44, 91 S.Ct. 746, 750–51, 27 L.Ed.2d 669 (1971). Nevertheless, it is also clear that equitable relief is not only permissible, but appropriate, under certain circumstances. In *Younger,* the Supreme Court held that federal courts as a rule should abstain from exercising jurisdiction when asked to enjoin pending state criminal proceedings, reflecting a public policy, based on federalism and comity, that disfavors federal court interference with state judicial proceedings. The Court recognized that certain types of injuries, in particular, the cost, anxiety and inconvenience of having to defend against a single criminal prosecution, could not by itself constitute the requisite "irreparable injury" which would warrant equitable relief. "Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.* at 46, 91 S.Ct. at 751 (citing *Ex Parte Young,* 209 U.S. 123, 145–47, 28 S.Ct. 441, 447–49, 52 L.Ed. 714 (1908)). The instant case is just such a case. Although plaintiffs state that they stand ready to have a jury determine their guilt or innocence, it is clear that their First Amendment rights cannot be adequately protected by defending themselves simultaneously or *seriatim* in each separate district in which they may be indicted. The enormous disparity between plaintiffs' resources and the resources of the government means, as a practical matter, that plaintiffs could be swiftly driven out of business before they ever set foot inside a courtroom.[38]

---

**38.** Furthermore, the instant case is unlike *Younger* in that plaintiffs here seek to enjoin action by federal, rather than state authorities. Our court of appeals has noted that *Younger* abstention does not apply where *federal* prosecutions threaten First Amendment rights. *See Juluke v. Hodel,* 811 F.2d 1553, 1556–58 (D.C.Cir. 1987) ("*Younger* has never been applied by the Supreme Court or this court in a situation involving civil and criminal proceedings in separate *federal* court actions. It is a case mostly about considerations of federalism.") (emphasis in original); *Freedberg v. U.S. Department of Justice,* 703 F.Supp. 107, 111 (D.D.C.1988). More importantly, it is beyond dispute that the *Younger* abstention doctrine does not apply to prosecutions brought in bad faith. *See Moore v.*

*Sims,* 442 U.S. 415, 424, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) (citing *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611, 95 S.Ct. 1200, 1211, 43 L.Ed.2d 482 (1975)); *CPDA,* 642 F.Supp. at 565. Finally, *Younger* abstention is inapplicable where, as here, no indictment has yet been returned. *See Wooley v. Maynard,* 430 U.S. 705, 710–12, 97 S.Ct. 1428, 1432–34, 51 L.Ed.2d 752 (1977) (*Younger* does not bar federal jurisdiction where plaintiffs are seeking prospective relief in the form of an injunction against prosecutions for future violations of state law); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 930–31, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975) (Restrictions of *Younger* do not obtain where no state proceedings pending against plaintiffs at time federal lawsuit was filed); *Juluke,* 811 F.2d

Plaintiffs point out that two other judges of this Court have granted preliminary injunctions against governmental conduct similar to the conduct at issue here. In *Playboy Enterprises, Inc. v. Meese*, 639 F.Supp. 581 (D.D.C.1986), plaintiffs sought a preliminary injunction preventing then Attorney General Meese and the members and officers of his Commission on Pornography from publishing a blacklist of distributors of alleged pornography in the Commission's final report. The Commission had sent letters to certain companies notifying them that they had been identified as involved in the sale or distributions of pornography and offered them an opportunity to respond prior to the Commission's issuance of its final report. The letter did not define pornography nor did it state who had provided the Commission with the name of the company. The court found that the purpose of the letter was to discourage distributors from selling certain sexually oriented materials which were constitutionally protected. Concluding that this constituted irreparable injury, the court granted plaintiffs' request for preliminary injunctive relief.

Likewise, in *Freedberg v. United States Department of Justice*, 703 F.Supp. 107 (D.D.C.1988), a mail-order distributor of sexually oriented materials alleged that the Attorney General, the NOEU, and several United States Attorneys had combined to cause plaintiffs to be investigated by grand juries in four states and imminently to be indicted and prosecuted in each, either simultaneously or *seriatim*, until a conviction was obtained under the federal obscenity statutes. The court entered a preliminary injunction preventing defendants from causing of permitting indictments to be returned against plaintiffs in more than one district without further order from the Court.

The defendants in *Freedberg* advanced many of the arguments advanced by the instant defendants—that the federal obscenity statutes have passed constitutional muster, that the statutes, which make each mailing of obscene materials a separate offense, authorize prosecution in each district in which obscene materials are delivered, that plaintiffs have no right to choose where they are prosecuted, that the separation of powers doctrine grants the Executive Branch exclusive discretion to decide the circumstances under which an offense shall be prosecuted, that courts of equity may not enjoin ongoing criminal prosecutions, and that plaintiffs have an adequate remedy at law because they can move to quash grand jury subpoenas and dismiss indictments once returned. The *Freedberg* court rejected these arguments, holding that simultaneous criminal prosecutions of the same individual for the same offense in four separate federal judicial districts was not consistent with due process. *Id.* at 110.

Relying on *Dombrowski*, the court rejected defendants' abstention argument, stating:

> When a plaintiff seeks a federal injunction against criminal prosecutions which are allegedly motivated by bad faith, in that they are brought to suppress conduct the authorities find objectionable even if constitutionally protected, the constraints upon the jurisdiction of the civil court do not obtain, at least in the absence of "pending" criminal prosecution.

*Id.* 703 F.Supp. at 112. The court refused to find that the ongoing grand jury investigations constituted "ongoing prosecutions" which a court of equity would be prevented from enjoining.[39]

The instant case is on all fours with *Freedberg*. The Supreme Court long ago recognized that "the cruelty of harassment by multiple prosecutions" can violate the Due Process clause of the Fifth Amendment. *Bartkus v. Illinois*, 359 U.S. 121, 127, 79 S.Ct. 676, 680, 3 L.Ed.2d 684 (1959).

---

at 1557 ("In order for *Younger* [abstention] to operate, the civil dispute must entail injunctive relief over an ongoing criminal prosecution").

**39.** *Younger* held that a federal court may not enjoin "ongoing" state prosecutions alleged to inhibit a criminal defendant's right of free speech, unless "the threat to [his] federally protected rights ... cannot be eliminated by his defense against a single criminal prosecution. 401 U.S. at 46, 91 S.Ct. at 751.

The question is whether the government is attempting "to wear [plaintiffs] out by a multitude of cases with accumulated trials." *Hoag v. New Jersey*, 356 U.S. 464, 467, 78 S.Ct. 829, 832, 2 L.Ed.2d 913 (1958) (quoting *Palko v. Connecticut*, 302 U.S. 319, 328, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937)). Plaintiffs have made such a *prima facie* showing here. Accordingly, their complaint states a claim under the Due Process clause.

Furthermore, like *Freedberg*, this case falls squarely within the *Younger* exception for cases in which First Amendment rights cannot be protected by "defense against a single criminal prosecution." The disparity between the resources of any criminal defendant and the federal government may mean that plaintiffs may be forced out of business before they ever have their day, or in this instance, days, in court. Like the plaintiffs in *Freedberg*, the instant plaintiffs face "annihilation, by attrition if not conviction." *Freedberg*, 703 F.Supp. at 111.

■ Defendants nonetheless attempt to distinguish *Freedberg* on its facts, maintaining that plaintiffs have not made a sufficient showing of bad faith here. The Court disagrees. Not only are plaintiffs' allegations of bad faith and harassment sufficient to overcome defendants' motion to dismiss, but plaintiffs have made a showing of bad faith sufficient to satisfy the first prong of the four-prong test for preliminary injunctive relief—substantial likelihood of success on the merits. A bad faith prosecution is generally defined as having been brought "without a reasonable expectation of obtaining a valid conviction." *Kugler v. Helfant*, 421 U.S. 117, 126 n. 6, 95 S.Ct. 1524, 1531 n. 6, 44 L.Ed.2d 15 (1975) (citation omitted). However, "[b]ad faith and harassing prosecutions also encompass those prosecutions that are initiated to retaliate for or discour-age the exercise of constitutional rights." *Lewellen*, 843 F.2d at 1109 (relying on *Younger* and *Dombrowski*). "A showing that a prosecution was brought in retaliation for or to discourage the exercise of constitutional rights 'will justify an injunction *regardless* of whether valid convictions conceivably could be obtained.'" *Id.* at 1109–10 (quoting *Fitzgerald*, 636 F.2d at 945) (emphasis added by *Lewellen*).

■ Plaintiffs' factual showing, as contained in the numerous declarations submitted in connection with their motion, demonstrate a substantial likelihood of success on the merits of their claim that defendants' conduct constitutes bad faith calculated to suppress plaintiffs' constitutional rights. It is not without significance that defendants have not contested, disputed, or refuted any of the factual assertions contained in the declarations presented by plaintiffs. When taken as a whole, these allegations suggest a concerted effort by the defendants, through harassment and threats of multiple prosecutions, to suppress plaintiffs' constitutionally protected activities.

The intrusive and intimidating manner in which defendants searched plaintiffs' premises, the 118 subpoenas which another federal court characterized as "harassment" of plaintiffs, the acknowledgement by the defendants that many of the materials they seek to prevent plaintiffs from distributing *are* constitutionally protected,[40] the allegation that investigations were initiated despite the fact that the FBI advised Showers, then Assistant United States Attorney for the Eastern District of North Carolina, that the materials distributed by plaintiffs were not within the scope of FBI guidelines for the prosecution or investigation of obscenity, the threats of multiple prosecutions if plaintiffs did not cease distribution of certain materials nationwide [41] and cease

---

**40.** It should be noted that there are other materials, the distribution of which defendants seek to restrict, which defendants do not concede are constitutionally protected.

**41.** Defendants argue vigorously that even had they been informed that the FBI did not consider plaintiffs' materials to be obscene, this would not support a claim of impermissible conduct. According to the defendants, to defer to the FBI's conclusion that the materials are not obscene would necessarily imply that there is a national standard for obscenity, which would directly contradict the Supreme Court's decision in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607,

distribution entirely in Utah, including *Playboy* magazine and *The Joy of Sex*, and the admitted desire to get Harvey "out of the business," substantiate plaintiffs' allegations of bad faith. This conclusion is fully consistent with *Bantam Books, Dombrowski*, and their progeny.

Defendants attempt to persuade the Court that the conditions they have demanded in exchange for non-prosecution of plaintiffs are not improper but are merely part of normal plea bargain negotiations. Defendants' self-serving characterization misses the mark. There is no distinction between the demands made by the government here and the consent decree in *CPDA* which the government attempted to coerce the plaintiffs in that case to sign. Both types of conduct amount to threats of prosecution for constitutionally protected activity. Furthermore, defendants' conduct here parallels that of the Rhode Island Commission to Enforce Morality in Youth in *Bantam Books*. The only difference between this case and *Bantam Books* is that in *Bantam Books*, the officers' threats of prosecution were "thinly veiled." Here, in contrast, the threats of prosecution are real and direct. What defendants overlook is the fact that they can accomplish their purpose, i.e., obliteration of plaintiffs' business, without ever obtaining a valid conviction.[42]

Furthermore, defendants' reliance on the constitutionality of the federal obscenity statutes under which plaintiffs may be charged is irrelevant. *See Krahm*, 461 F.2d at 707 ("In the vital area of First Amendment rights it is just as easy to

discourage exercise of them by abusing a valid statute as by using an invalid one").

As explained above, the Court finds that plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that defendants' conduct has violated the First Amendment as well as the Due Process clause of the Fifth Amendment.[43]

 Plaintiffs have also satisfied the other elements required for the granting of an application for preliminary injunctive relief. A bad faith prosecution constitutes irreparable injury sufficient to warrant preliminary injunctive relief. *See Dombrowski*, 380 U.S. at 485–86, 85 S.Ct. at 1120–21; *Lewellen*, 843 F.2d at 1109. Furthermore, the infringement of First Amendment rights clearly constitutes irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *Playboy Enterprises*, 639 F.Supp. at 586 (citing *Dombrowski*, 380 U.S. at 489, 85 S.Ct. at 1122).

Finally, the balance of the equities favors plaintiffs. There is no legitimate interest in bad faith prosecutions which seek to suppress constitutionally protected speech. *See Playboy Enterprises*, 639 F.Supp. at 587. Simply stated, "it is in the public interest to uphold a constitutionally guaranteed right." *Freedberg*, 703 F.Supp. at 111 (quoting *Playboy Enterprises*, 639 F.Supp. at 587). Defendants protest that a preliminary injunction would "bar[ ] [them] from pursuing investigations against plaintiffs anywhere, even though it may well be the case that plaintiffs have violated federal obscenity statutes in a variety of jurisdictions,"[44] and would be a "serious re-

---

37 L.Ed.2d 419 (1973). Yet by demanding that plaintiffs cease distribution of certain materials *nationwide*, defendants make precisely the same assumption, i.e., that there is a national standard for obscenity.

**42.** PHE asserts that it has already expended in excess of $700,000 in connection with the search of its premises on May 26, 1986, and the subsequent defense and acquittal of obscenity charges in the criminal prosecution in Alamance County, North Carolina, Declaration of David Groves, Chief Financial Officer of PHE, Inc., ¶ 3, and an additional $14,000 in legal fees for the preparation of a motion to quash in connection with subpoenas issued to PHE on December 22, 1989

by the Western District of Kentucky and April 11, 1990 by the Central District of Utah. Supplemental Declaration of David Groves, ¶ 3.

**43.** To the extent that plaintiffs are asserting a double jeopardy claim, the Court need not address it at this time. Although *Freedberg* noted that successive federal prosecutions on related obscenity charges could be challenged as a violation of the Double Jeopardy clause of the Fifth Amendment, 703 F.Supp. at 110, it, too, did not decide the issue.

**44.** Memorandum of Points and Authorities in support of Defendants' Motion to Dismiss and in Opposition to Plaintiffs' Motion for Preliminary Injunction, p. 43.

striction on the power of the Executive Branch to exercise its prosecutorial discretion and authority." [45] These identical arguments were raised and rejected in *Freedberg:*

> Neither [argument], in the Court's opinion, represents a hardship equivalent to defending against multiple prosecutions, commencing immediately and continuing for an indefinite future, which is what plaintiffs can, with reason, anticipate if defendants are not restrained until the merits are decided. All defendants will suffer is an inconvenient delay, and some loss of tactical advantage, in launching their offensive. Plaintiffs, on the other hand, are confronting annihilation, by attrition if not conviction.

*Freedberg*, 703 F.Supp. at 111. These words are equally applicable here.

For all these reasons, the Court finds that plaintiffs have satisfied the requirements for the issuance of a preliminary injunction.

The more difficult question concerns the type of injunctive relief to be granted. At argument, plaintiffs requested three types of injunctions: the first, the type granted by the *Freedberg* court, enjoining multiple prosecutions until this case is resolved on the merits; the second, the type granted in *CPDA* which would enjoin any prosecution in the Western District of Kentucky and Utah for materials distributed prior to the date the instant complaint was filed on the bases that such materials would be tainted by the bad faith of the government; the third, an injunction prohibiting bad faith prosecutions from being brought anywhere in the country based on any materials distributed in the past or to be distributed in the future. Plaintiffs have made clear that they do not seek to enjoin good faith prosecutions and would therefore not object to an injunction prohibiting any indictments from being returned during the pendency of this case unless defendants demonstrate that any such indictment is not tainted by their present strategy.

At this stage of the proceedings, an injunction identical to the one issued in *Freedberg* is the most appropriate form of relief.

### III.

For these reasons, it is accordingly hereby

ORDERED that defendants' motion to dismiss is denied. It is further

ORDERED that plaintiffs' motion for a preliminary injunction is granted and defendants United States Department of Justice, United States Attorney General Richard Thornburg, the National Obscenity Enforcement Unit ("NOEU") and its Acting Director Patrick Trueman, Assistant United States Attorney for the District of Utah Richard N.W. Lambert, and United States Attorney for the Western District of Kentucky Joseph M. Whittle are preliminarily restrained and enjoined from causing or permitting indictments to be returned against plaintiffs, or either of them, in more than one federal judicial district within the United States, pending determination of this case on the merits or further order of this Court.

Pursuant to Fed.R.Civ.P. 65(c), plaintiffs shall post in the Clerk's Office a $1,000 cash or surety bond no later than July 27, 1990 at 3:00 p.m. failing which this injunction shall immediately stand dissolved. In the event of an appeal there shall be no stay of this order for the reasons recited in this memorandum opinion. It is further

ORDERED that plaintiffs shall file their motion for permanent injunction on or before August 10, 1990; defendants shall file their opposition thereto on or before August 24, 1990; plaintiffs shall file their reply thereto, if any, on or before August 31, 1990. There shall be a hearing on plaintiffs' motion for permanent injunction on September 28, 1990 at 1:30 p.m. Should witnesses be called to testify for either side, their names are to be provided to the other parties and the Court 48 hours prior to their testimony.

IT IS SO ORDERED.

45. *Id.*

**28**

### ORDER

Presently pending before the Court is defendants' motion to modify preliminary injunction order. Defendants request a modification to the preliminary injunction issued on July 23, 1990 to specify that all restrictions placed on the defendants are limited to the enforcement of obscenity laws and matters related thereto based upon matters currently under investigation by grand juries. Upon consideration of the motion, plaintiffs' opposition, defendants' reply, and the entire record, it is hereby

ORDERED that defendants' motion to modify the preliminary injunction is granted in part and the preliminary injunction issued July 23, 1990 is amended to read as follows:

FURTHER ORDERED that defendants United States Department of Justice, National Obscenity Enforcement Unit, Thornburg, Trueman, Lambert, and Whittle, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, are preliminarily restrained and enjoined from causing or permitting indictments charging violations of 18 U.S.C. §§ 1461–65 to be returned against plaintiffs, or either of them, in more than one federal judicial district within the United States, pending determination of this case on the merits or further order of this Court.

It is further

ORDERED that in all other respects, plaintiffs' and defendants' requests for modification of the preliminary injunction issued July 23, 1990 are denied. It is further

ORDERED that the preliminary injunction aforesaid, as amended, is reissued.

IT IS SO ORDERED.