See also, D.C., 118 F.R.D. 252.

**Tony AVIRGAN, et al., Plaintiffs,**

v.

**John HULL, et al., Defendants.**

**Misc. No. 87–252.**

United States District Court,
District of Columbia.

July 31, 1987.

Stephen M. Kohn, Washington, D.C., for intervenor Village Voice.

Thomas C. Green, Sharp, Green & Lankford, Washington, D.C., for certain defendants.

Mark H. Tuhoey, III, Pierson, Ball & Dowd, Washington, D.C., for Robinette, third-party deponent.

1. All of the represented defendants in the Florida action, except Robert Owen and Bruce Jones, were represented by Thomas C. Green, counsel for defendant retired Air Force Major General Richard V. Secord, for the limited purpose of the instant motion. *See* Letter from Thomas C. Green to the Court, July 23, 1987 and Letter from Mark H. Tuohey, III, to the Court, July 23, 1987.

2. *The Village Voice,* represented by the Government Accountability Project, moved to intervene in this miscellaneous motion on July 23, 1987. At the hearing, the Court allowed *The Village Voice* to participate as *amicus,* but denied its motion to intervene as of right. Counsel for *The Village Voice* now moves for reconsideration of that ruling and also seeks to intervene on behalf of WBAI Radio (New York City) and *In These Times.*

Intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2) should be granted where a party has an interest in the

Daniel P. Sheehan, The Christic Institute, Washington, D.C., for Avirgan.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

■ This miscellaneous matter comes before the Court on third-party deponent Glenn A. Robinette's July 22, 1987 motion for a protective order to prevent the attendance of the press and other members of the public at his deposition then scheduled for July 23, 1987. The Court stayed that deposition to have the benefit of briefing and oral argument on the interesting and novel issue presented by the motion—the proper scope of public access to pretrial proceedings in civil cases. In consideration of the motion joined by defendants,[1] and the opposition thereto of plaintiffs and *amicus curiae The Village Voice,*[2] and for the reasons set forth below, Robinette's motion is stayed pending further briefing on the issue of good cause.

### I. Factual Background

The underlying action for this miscellaneous motion, *Avirgan v. Hull,* Civil Action No. 86–1114, is pending before Chief Judge King, of the United States District Court for the Southern District of Florida. Al-

action that may as a practical matter be impaired or impeded, unless there is adequate representation by existing parties. Although it agreed substantially with plaintiffs' position, *The Village Voice* articulated at the hearing the interests of the press seeking access to Robinette's deposition sufficiently independent of plaintiff to warrant granting intervention as of right. Notably, the other parties have not opposed the motion. The existence of a stipulation among some *defendants* in the underlying action allowing access by the press to a prior deposition, *see* discussion *infra* and Tr. at 14, only supports the conclusion that under these circumstances intervention is appropriate.

Accordingly, *The Village Voice*'s motion for reconsideration is granted and it shall be allowed as an plaintiff-intervenor in this miscellanous matter. The motions of *In These Times* and WBAI Radio are denied as they have not demonstrated that their interests are sufficiently distinct from that of *The Village Voice* to merit independent intervention, particularly since they are represented by the same counsel.

though the facts of that case are not directly relevant to the instant motion, a brief synopsis is useful merely to set this matter in context.

The Florida case was brought in May 1986 by the Christic Institute, a public interest law firm and interfaith public policy center located in Washington, D.C., on behalf of ABC news cameraman Tony Avirgan and his wife Martha Honey, also a professional journalist, for personal and business injuries resulting from the bombing of a press conference held by dissident contra leader Eden Pastora in Nicaragua in 1984. Plaintiffs also claim injuries resulting from the alleged conspiratorial operation by twenty-nine defendants—several of whom have emerged as important figures in the subsequent congressional investigation of the Iran–Contra Affair—of a Costa Rican-based terrorist organization, financed by international drug smuggling, that launched attacks on Nicaragua. Plaintiffs' Appendix ("Pls.App.") D (Complaint).

Plaintiffs claim that they first heard about Robinette's potential involvement in the network of individuals and facts alleged in their Florida action from his interviews with the press in March 1987 and from his June 23, 1987 testimony before the House/Senate Select Committee on the Iran–Contra Affair. Plaintiffs' Opposition to Motion for Protective Order ("Pls.Opp.") at 2–3. During that testimony, Robinette admitted under grant of limited immunity, that he had accepted payments of several thousand dollars from retired Air Force Major General Richard V. Secord channelled through Swiss bank accounts to develop "derogatory" information on counsel for plaintiffs, the Christic Institute, in an attempt to hinder the Florida action because of its potential for exposing the "Enterprise." Pls.App. G (transcript of testimony of Robinette before Joint House/Senate Select Committee investigating the Iran–Contra Affair).

Plaintiffs noticed Robinette's deposition on July 1, 1987, Pls.App. A, and the Christic Institute arranged to have Robinette's deposition taken in a conference room that could accommodate fifty people at the Washington, D.C. office of the American Civil Liberties Union. Pls.App. C at 1. On July 2, 1987, the Christic Institute issued a press release regarding the Robinette testimony, stating where and when Robinette was going to be deposed. Motion for Protective Order ("Motion"), Exhibit A (corrected).

After the *Washington Post* published an article on June 29, 1987 regarding Robinette's congressional testimony, and presumably as a result of the its own press release, the Christic Institute received requests from the media for information regarding attendance of the Robinette deposition. Affidavit of Lanny Alan Sinkin ("Sinkin Aff."), Pls.App. C at 1. The Christic Institute informed them of the time and place of the deposition and "[i]n fairness to other members of the media," then contacted other members of the press about the deposition and to arrange reserved seating. *Id.* Reservations were made for reporters from *Time Magazine, U.S. News and World Report, The Village Voice,* and *Rolling Stone Magazine.* Reporters from the *Washington Post,* the Associated Press, and the Religious News Service also apparently planned to attend. *Id.* at 1–2.

Robinette, who claims that he became aware of this press release the week of July 20, just prior to his deposition, alleges in his motion that the release "sets forth ... absolute false statements" about his congressional testimony. Transcript of July 24, 1987 Hearing on Motion for Protective Order ("Tr.") at 7. More importantly for the purposes of the instant motion, Robinette objects to the release because it "solicited" the attendance of the press at his deposition and created a "circus atmosphere." *Id.*

Robinette requests in his motion that this Court restrict the attendance at his deposition to only parties and their counsel and that it be held at his counsel's law firm. Tr. at 8, 11.

Counsel for defendants requests this Court to await a ruling by Chief Judge King on his motion for a protective order pending before that court. Tr. at 40. With all due respect to the our sister court in

Florida, the issue presented by the instant motion appears quite singular and need not be postponed until rulings on motions pending before Chief Judge King. Furthermore, this Court's ruling does not impinge on Chief Judge King's broad discretion to determine ultimately the degree of public access to the deposition in question or to manage the progress of the underlying case and the conduct of counsel.[3]

## II. Analysis

The narrow legal issue presented by the motion is whether and under what circumstances a third-party deponent can limit the access of the press and the general public to the taking of his deposition.[4]

While the "precise contours" of the public's first amendment rights to judicial proceedings are still "in the process of being drawn," *In re the Reporters Committee for Freedom of the Press*, 773 F.2d 1325, 1331 (D.C.Cir.1985),[5] the Supreme Court has clearly held that judicial rules of procedure that require a movant for a protective order limiting pretrial discovery to demonstrate good cause appropriately balance the constitutional and governmental interests at stake. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

In *Seattle Times*, the Supreme Court upheld the trial court's imposition of a protective order on a party-defendant[6] restraining the defendant-newspaper from disseminating information acquired in the course of pretrial discovery on the basis of a state rule that mirrors Federal Rule of Civil Procedure 26(c). In light of the first amendment interests implicated by the protective order, the Court subjected the good cause standard to "middle tier" constitutional scrutiny, *i.e.*, an evaluation of whether the " 'practice in question [furthers] an important or substantial governmental interest unrelated to the suppression of expression' and whether 'the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* at 32, 104 S.Ct. at 2207 (citations omitted).[7] The Court concluded that

3. The Court declines to accept the parties' and counsel for Robinette's invitation to involve itself in the continuing charges of unethical conduct that they have lodged against each other. *See, e.g.*, Letter of Thomas C. Green to Court, July 24, 1987; Tr. at 23–27; Motion, at 5; *id.* at App. B (corrected) (Christic Institute press release), at 3. Not only are such allegations irrelevant to the instant motion, but they are best addressed through the underlying action before Chief Judge King, who is intimately familiar with the conduct of counsel.

4. Robinette's motion frames the question broadly as "whether the press should have *access* to the deposition of a non-party." Motion at 4 (emphasis added). This formulation is overbroad. The precise issue here is the right of the press, parties, and deponent with regard to the *taking* of the deposition; the question of *ultimate* access to the information contained in the deposition through the transcript, as it is affected by filing requirements and motions for sealing or redaction, is an issue reserved for future deliberation by the Court with which the deposition is filed.

5. Notably, not until 1980 did the Supreme Court find a constitutional right to observe criminal trial proceedings. *In re the Reporters Committee for Freedom of the Press*, 773 F.2d 1325, 1331 (D.C.Cir.1985) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575, 100 S.Ct. 2814, 2826, 65 L.Ed.2d 973 (1980)). And, although this right had not yet been applied to civil trials, this "Court" would agree with the Supreme Court's "intimations" that it should. *Id.* (citing *Richmond*, 448 U.S. at 580 n. 17, 100 S.Ct. at 2829, n. 17). That right has not, however, clearly been extended to records in criminal or civil cases, much less *potential* court records. *Id. See Tavoulareas v. Washington Post Co.*, 724 F.2d 1010 (D.C.Cir.1984).

6. The Christic Institute attempts to distinguish *Seattle Times* on the basis that that case involved only the claim of *one* of the parties, a newspaper, of the right to disseminate information acquired during the course of pretrial discovery, whereas in this case the issue is the right of the public to such information. This is a distinction without a difference. *Seattle Times* is precisely on point and thoroughly analyzes the judicial, public, and other interests involved in the instant motion, particularly where as here the interests of the Christic Institute appear quite similar to that of the newspaper in *Seattle Times*.

7. Contrary to Robinette's assertion, the *Seattle Times* test and not the two-part test articulated in *Reporters Committee* applies to the instant motion. In *Reporters Committee*, the issue before the Court of Appeals was whether the district court properly sealed documents in a civil defamation suit until entry of judgment. As the

the state rule 26(c) "furthers a substantial governmental interest unrelated to the suppression of expression," *id.* at 34, 104 S.Ct. at 2208, that is, prevention of abuses of the discovery process such as the release of "information that not only is irrelevant but if publicly released could be damaging to reputation and privacy." *Id.* at 35, 104 S.Ct. at 2209.[8] The Court also found that the good cause standard passed this test. "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required.... The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery. The unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders." *Id.* at 36, 104 S.Ct. at 2209.

Based on this analysis of the competing interests involved, *Seattle Times* approved the showing of good cause found by the trial court. Plaintiffs in *Seattle Times* —the spiritual leader of the Aquarian Foundation, Keith Milton Rhinehart, and the Foundation itself—had brought an action against the newspaper for publication of certain allegedly defamatory articles. The newspaper sought production of documents pertaining to the financial affairs of plaintiff, including the identity of the Foundation's donors. The trial court found

initially that the facts alleged were "too conclusory to warrant a finding of 'good cause,' as required by [Rule 26]." *Id.* at 25–26, 104 S.Ct. at 2203. That court allowed, however, plaintiffs to move for reconsideration on "a *factual* showing of good cause for restraining defendants in the use of those materials." *Id.* (emphasis added). Plaintiffs then submitted several affidavits detailing a series of letters and telephone calls defaming and threatening Rhinehart and the Foundation, as well as information about "attacks, threats, and assaults" directed at Foundation members. The affidavits averred that "public release of the donor list would adversely affect membership and subject its membership to additional harassment and reprisals." *Id.* at 26–27, 104 S.Ct. at 2204. The trial court was persuaded by these new submissions and issued a protective order covering all information obtained through the discovery process pertaining to financial affairs of Rhinehart and the Foundation. *Id.*

■ Similarly, the Court here must determine whether Robinette has sufficiently demonstrated good cause under Federal Rule of Civil Procedure 26 to warrant a protective order denying public attendance at his deposition. It is well established that a movant for a protective order must articulate specific and particular facts showing good cause, and not merely allege

---

documents in question were court records, the court resolved the issue "on the basis of the analysis which the [Supreme] Court has brought to bear in this general field" of the public's first amendment right of access to judicial proceedings. 773 F.2d at 1331. The court then found its inquiry framed by two questions: (1) whether the proceeding has historically been open, and (2) whether the right of access plays an essential role in the proper functioning of the judicial process and the government as a whole. *Id.* In the instant case, a federal rule of civil procedure directly affects the power of the trial court to fashion protective relief, and the implication of that rule was addressed by the Supreme Court in *Seattle Times.*

Although *Seattle Times* may not have expressly overruled *In re Halkin*, 598 F.2d 176 (D.C.Cir. 1979), the Supreme Court clearly rejected the strict scrutiny test applied by the Court of Appeals for the District of Columbia Circuit and adopted a middle-tier standard of review. *See Halkin*, 598 F.2d at 186, 191 *and Seattle Times,*

467 U.S. at 25 n. 6, 29, 32–33, 104 S.Ct. at 2203 n. 6, 2205, 2207, 2208.

**8.** The Court made clear that "a litigant has no First Amendment right of access to information made available only for purposes of trying his suit." *Id.* at 32, 104 S.Ct. at 2207. More specifically, the Court observed that "[m]oreover, pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law ... and, in general, they are conducted in private as a matter of modern practice." *Id.* at 33, 104 S.Ct. at 2207–08. The rationale for limiting access on a showing of good cause is not difficult to discern. As the Supreme Court observed, "[m]uch of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted information, are not a restriction on a traditionally public source of information." *Id.*

"stereotyped and conclusory statements." *See Tavoulareas,* 724 F.2d 1010 (D.C.Cir. 1984); 8 Wright & Miller, Federal Practice and Procedure, Civil, § 2035 at 265 (1970).

■ Robinette's counsel argued that protection is necessary because of the " 'annoyance, embarrassment, [and] oppression' which would result from attendance by the press at the deposition." Motion, at 5. No affidavit from Robinette, however, was provided to support these conclusory statements. The Court agrees with The Christic Institute that this proffer is "nothing more than a bald assertion of fact," Pls.Opp. at 7, which fails to meet a movant's burden under Rule 26(c). As *The Village Voice* pointed out, the showing of good cause approved by the Court in *Seattle Times* regarding the adverse impact of the disclosure of financial information is "far from the type of pleadings or representations made to this Court and any concern that Mr. Robinette may have concerning his physical safety or why the presence or the press at his deposition would create any harm to himself or in any way interfere with the proceedings in this case. The press does not have the right to ask questions at a deposition. They would merely sit quietly and take notes." Tr. at 32.

Taking into account the short notice that counsel for all parties had for preparation their presentation on the motion, however, and the zest with which the Christic Institute has invited the press to the deposition, the Court cannot conclude in the interests of justice that deponent Robinette is completely unable to prove good cause, merely that he has not yet done so to this Court's satisfaction. Accordingly, the Court will allow *all* of the parties to provide further briefing and documentation solely on this issue.

■ In viewing these submissions, the Court is quite aware that it is highly unusual to allow the press to attend a deposition [9]; there may be certain practical difficulties in addition to an impingement on the efficient administration of justice and the privacy rights of the deponent [10] potentially posed by encouragement of open access to depositions in civil cases. On the other hand, the Court is also well aware that allowing the press to attend a deposition does not impede the Court's ability to fashion various protective measures or prevent a deponent from asserting his rights under Federal Rules of Civil Procedure 26 and 30.

### III. Conclusion

For the reasons set forth above, Robinette's motion is stayed pending further briefing on the showing of good cause for the issuance of a protective order. The Court was informed by counsel that there is currently no termination date for discovery in the Florida action, but that trial is projected for mid–1988. Justice requires a full and deliberate decision on this important issue. Accordingly, it is hereby

ORDERED that deponent Robinette and defendants shall file on or before August 10, 1987 any brief and supporting materials showing good cause for a protective order to issue; plaintiffs and plaintiff-intervenor shall file any response thereto and supporting materials on or before August 17, 1987; reply, if any, by August 21, 1987. Pending further Order of the Court, the deposition shall continue to be stayed.

IT IS SO ORDERED.

9. The Christic Institute admits that in the vast majority of cases, the press does not attend depositions, although the press apparently attended depositions in a case previously handled by the Christic Institute, the *Silkwood Case.* Tr. at 18.

10. In articulating the factual foundation for good cause, movant cannot rely alone, however, on the potential impact of mere release of the information covered at his deposition. Ultimately such information, or much of it, might be released when the deposition transcript is filed under Rule 30(f)(1). Assuming that the deposition is filed, then the issue also involves a question of timing, that is, the value to the press of *contemporaneous* reporting of the information revealed at the deposition.